J-S08036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JAVONN ERIC CLANCY | : | |
| | : | |
| Appellant | : | No. 1037 WDA 2016 |

Appeal from the PCRA Order June 16, 2016
In the Court of Common Pleas of Beaver County
Criminal Division at No(s):  CP-04-CR-0001902-2012

BEFORE:   GANTMAN, P.J., FORD ELLIOTT, P.J.E., and SOLANO, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED FEBRUARY 22, 2017**

Appellant, Javonn Eric Clancy, appeals from the order entered in the Beaver County Court of Common Pleas, which denied his first petition brought pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

A prior decision of this Court sets forth the relevant facts of this appeal as follows:

> [O]n July 30, 2012, [Appellant] and Dyquane Norman as well as several other witnesses to this incident were present at the Linmar Terrace community center….  Upon leaving the community center, [Appellant], Norman, and several other individuals walked to the 300 block of Linmar Terrace to relax.  Approximately 15 to 20 minutes later, [Marquay Lavar] Riggins [("Victim")] arrived at Linmar Terrace….  [Victim] approached Norman with the intention of discussing and settling a dispute involving an alleged

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

robbery of [Victim's] cousin by Norman's and [Appellant's] friend, Damontae Williams.

While they were resolving their dispute, [Appellant] approached [Victim] and Norman, cut between them, and began to insult [Victim. Victim] responded to [Appellant's] insults by approaching him and asking him what the problem was. At that point, [Appellant] punched [Victim], and [Victim] knocked [Appellant] to the ground and began hitting him. After grappling with [Appellant] on the ground for several seconds, [Victim] was pulled off of [Appellant] by Norman, Devay Owens, and Tyquale Owens. Once [Appellant] and [Victim] were separated, [Appellant] pulled a gun from his clothing and fired multiple shots at [Victim. Victim] attempted to run from [Appellant] but was shot three times in the back. [Victim] collapsed in the street nearby, and [Appellant] fled the scene. After fleeing Linmar Terrace, [Appellant] was seen running into a nearby wooded area and in downtown Aliquippa. Once [Victim] collapsed, Norman and Devay Owens called 911, and the fire department and medic rescue arrived to render assistance to [Victim]. Ultimately, however, [Victim] died as a result of the gunshot wounds.

On that same date of July 30, 2012, Detective Sergeant Steve Roberts of the Aliquippa Police Department issued a "be on the lookout" alert for [Appellant] and obtained a warrant for his arrest. Despite attempts to secure [Appellant's] arrest, [Appellant] continued to avoid apprehension until September 4, 2012, when [he] turned himself in to authorities….

**Commonwealth v. Clancy**, No. 1594 WDA 2013, unpublished memorandum at 1 (Pa.Super. filed Aug. 29, 2014), *appeal denied*, 631 Pa. 723, 112 A.3d 649 (2015) (quoting Trial Court Opinion, filed Aug. 28, 2013, at 4-5). The prior trial court opinion also provides:

Between the date of the shooting and the date [Appellant] surrendered to law enforcement, [Appellant] remained in contact with Norman through Facebook. During that time, [Appellant] utilized the Facebook username of "Snitch-Free

- 2 -

Jay" and made several comments to Norman regarding the shooting….

(*Id.* at 5-6). The Commonwealth charged Appellant with first-degree murder and firearms not to be carried without a license.[2] Appellant proceeded to a jury trial on April 8, 2013.

At trial, Dyquane Norman testified that he argued with Appellant on Facebook after the shooting:

> [COMMONWEALTH]: Did you have any contact with him after this incident?
>
> [MR. NORMAN]: Yeah, we got into it on Facebook through messages.
>
> [COMMONWEALTH]: And what was, and what is his Facebook page?
>
> [MR. NORMAN]: I think it was, no, I know it was Snitch-Free-Jay.
>
> [COMMONWEALTH]: Snitch-Free-Jay. What does "snitch free" mean?
>
> [MR. NORMAN]: That he's not a snitch, I guess.
>
> [COMMONWEALTH]: What does being a snitch mean?
>
> [MR. NORMAN]: Telling on somebody.
>
> [COMMONWEALTH]: Is that sort of the mentality in Linmar?
>
> [MR. NORMAN]: Yeah, basically, yeah.

(N.T. Trial, 4/10/13, at 121). Detective Roberts also testified about the

_____

[2] 18 Pa.C.S.A. §§ 2502(a) and 6106(a)(1), respectively.

- 3 -

"snitch free" outlook in Linmar:

> [COMMONWEALTH]: What does "snitch free" mean to you?
>
> [DET. ROBERTS]: It means that you won't rat, you won't tell about things, you won't tell the police about things that happen, crimes that happen within the community that you might have witnessed or have information on.
>
> [COMMONWEALTH]: How long have you been an officer in the City of Aliquippa?
>
> [DET. ROBERTS]: 15 years.
>
> [COMMONWEALTH]: Have you encountered this type of attitude?
>
> [DET. ROBERTS]: Yes, multiple times.
>
> [COMMONWEALTH]: And is it an attitude that you would say is prevalent in Aliquippa?
>
> [DET. ROBERTS]: Yes, it is.
>
> [COMMONWEALTH]: How about in Linmar Terrace?
>
> [DET. ROBERTS]: Yes, it's very prevalent in Linmar Terrace?

(N.T. Trial, 4/11/13, at 33).

The Commonwealth also questioned Appellant about his Facebook profile name:

> [COMMONWEALTH]: Snitch-Free-Jay, that's you; right?
>
> [APPELLANT]: Yes.
>
> [COMMONWEALTH]: What does "snitch free" mean?

[APPELLANT]:                    Just a, just a name I put, sir.

[COMMONWEALTH]:           I'm sorry?

[APPELLANT]:                    It's just a name I put, sir.

[COMMONWEALTH]:           What does to be "snitch free" mean?

[APPELLANT]:                    It means not to snitch.

[COMMONWEALTH]:           Not to snitch, not to tell people or go to the police and tell on your friends; right?

[APPELLANT]:                    I mean I guess, yes.

(*Id.* at 133-34).   The Commonwealth then asked Appellant about the murder weapon:

[COMMONWEALTH]:           How long did you possess that gun?

[APPELLANT]:                    I had it for, like, a week.

[COMMONWEALTH]:           You only had it a week?

[APPELLANT]:                    Yeah.

[COMMONWEALTH]:           Where did you get it from?

[DEFENSE COUNSEL]:        Objection to relevance, Your Honor.  It's not—

THE COURT:                     Side bar.

(WHEREUPON, the following proceedings were had at side bar:)

THE COURT:                     All right.  State your objection.

[DEFENSE COUNSEL]:        Your Honor, he is trying to prove a possessory offense of a firearm.  He's not charged with received it or stealing it or anything along those lines.

- 5 -

It's beyond the scope and is irrelevant to these proceedings.

[COMMONWEALTH]: Your Honor, the theory of this case is that he is a snitch-free person. There is a lot of his testimony that he skipped. He has been on the lam for over a month. I plan to ask him everything, what friends, how did he get to Pittsburgh.

THE COURT: This is a whole different from his objection.

[COMMONWEALTH]: It goes—

THE COURT: His objection is you are asking where he got the gun, and he objected and says it's not relevant. He is not on trial for receiving stolen property. The only charge he is on is firearms not be carried without a license. Now, if you are going to tell me how where he got it at is relevant, I will listen. If not, I will sustain the objection.

[COMMONWEALTH]: It is. It goes to the relevancy of his character, Judge, that he is that snitch-free, and he's not going to rat out his friends.

THE COURT: It has nothing to do with how he got the gun and if it does, I have to balance the probative value versus the prejudicial value. Sustained.

[COMMONWEALTH]: Thank you.

(WHEREUPON, the side bar proceedings were concluded, and thereafter the following proceedings were had in open [c]ourt:)

THE COURT: I sustained the objection.

(*Id.* at 137-39). The Commonwealth also questioned Appellant about his

flight after the shooting:

[COMMONWEALTH]: And then you went to Pittsburgh?

- 6 -

[APPELLANT]:          Yes.

[COMMONWEALTH]:      How do you get to Pittsburgh?

[APPELLANT]:          I got a ride.

[COMMONWEALTH]:      A ride by whom?

[APPELLANT]:          A friend of mine.

[COMMONWEALTH]:      Who's that friend?

[APPELLANT]:          Just a friend.

[COMMONWEALTH]:      Who's that friend?

[APPELLANT]:          It was just a friend of mine, sir.

[COMMONWEALTH]:      You're Snitch-Free-Jay you don't rat; right?

[APPELLANT]:          I said it was just a friend, sir.

[COMMONWEALTH]:      Who's that friend?

[APPELLANT]:          It was just a friend of mine.

[COMMONWEALTH]:      Tell me who that friend is.

[DEFENSE COUNSEL]:    Asked and answered, Your Honor. At this point he is badgering the witness.

[COMMONWEALTH]:      Your Honor, he is refusing to answer the question.

THE COURT:            He said a friend.

[COMMONWEALTH]:      What friend?

[APPELLANT]:          A friend, sir.

[COMMONWEALTH]:      Where does this friend live?

[APPELLANT]:                It was just a friend of mine, sir.

[COMMONWEALTH]:       Snitch-Free-Jay; right?

[APPELLANT]:                If that's what you want to call me, sir.

[COMMONWEALTH]:       You go to Pittsburgh.  Where at in Pittsburgh?

[APPELLANT]:                I went to a friend of mine's house in Pittsburgh, sir.

[COMMONWEALTH]:       Do you know the name of that friend?

[APPELLANT]:                It was just a friend, sir.

[COMMONWEALTH]:       Snitch-Free-Jay.

[APPELLANT]:                That's what you call me, sir.

[COMMONWEALTH]:       Is that where you stay?

[APPELLANT]:                Where?

[COMMONWEALTH]:       That unnamed, unknown friend in Pittsburgh?

[APPELLANT]:                Yes, sir.

[COMMONWEALTH]:       What part of Pittsburgh?

[APPELLANT]:                It's just on the North Side, sir.

[COMMONWEALTH]:       What's the address?

[APPELLANT]:                I don't know—

[DEFENSE COUNSEL]:   I would object—

                              *    *    *

[DEFENSE COUNSEL]:   I  would  object  to  relevance,

Your Honor.

[COMMONWEALTH]:     Your Honor, I have a right to know where he went.

THE COURT:     Side bar.

(WHEREUPON, the following proceedings were had at side bar:)

THE COURT:     Okay.     Let's     hear     your objections.

[DEFENSE COUNSEL]:     Your Honor, I am going to object as to relevance at this point.  It's more than clear that [Appellant] left the scene and was gone for over a month.  The Commonwealth is going to get the flight to avoid apprehension charge to the jury.

To get into the details, there is no relevancy to it, because he is not charged with any other offense relating to that conduct.  The fact that he was gone for a month is enough.

THE COURT:     I can't hear you.

[DEFENSE COUNSEL]:     The fact that he was gone is enough.  Where he went and what he did isn't relevant, because he is not charged with one of those offenses.  At this point, the purpose of the question is to badger the witness.

THE COURT:     Okay.  Your response.

[COMMONWEALTH]:     Your Honor, there is testimony that while he is away he is still making contact with Dyquane Norman.  Obviously this goes to his "snitch free" attitude.  This is very relevant.  He is on the lam for a month.

THE COURT:     The standard for relevancy is does it have a tendency to prove a relevant point.

[COMMONWEALTH]:     It goes to his—

THE COURT: So, it's basically materiality and also the relationship. Now, in this particular case the fact the he fled after the fact has a potential relevancy to the Commonwealth in regard to consciousness of guilt for flight.

Now, the Commonwealth can ask him where he went. You can ask him several times where he went. If he just says friends, but at a certain point, Mr. Quinn, he is not going to say, and now it's becoming redundant, so you can ask your questions. But if he says, a friend and you ask who is the friend and he says a friend again, then it's time to move on.

[COMMONWEALTH]: And then before it was objected to I asked the address, so I am moving on with a different question.

THE COURT: I understand that, but, you know, it becomes cumulative. I can sustain his objection that way, but I am going to let you have latitude, because it is relevant in regards to consciousness of guilt, Mr.— so I am going to overrule the objection, but ask you to keep it within reason. If it becomes cumulative, well, he can renew his objection.

MR. QUINN: Yes, Your Honor.

(WHEREUPON, the side bar proceedings were concluded and thereafter the following proceedings were had in open [c]ourt:)

THE COURT: All right. I have overruled the objection.

(*Id.* at 150-55).

On April 12, 2013, the jury convicted Appellant of first-degree murder and carrying a firearm without a license. The court sentenced Appellant on May 29, 2013, to life imprisonment on the murder conviction, with a concurrent term of 2 to 7 years' imprisonment on the firearms conviction.

On Monday, June 10, 2013, Appellant timely filed post-sentence motions, which the court denied on August 28, 2013. This Court affirmed the judgment of sentence on August 29, 2014, and our Supreme Court denied allowance of appeal on March 9, 2015.

Appellant filed his first PCRA petition on August 13, 2015, and the PCRA court appointed counsel. On November 17, 2015, Appellant filed an amended PCRA petition. Following a hearing, the PCRA court denied Appellant's petition on June 16, 2016. On July 15, 2016, Appellant filed a timely notice of appeal. That same day, the PCRA court ordered Appellant to file a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b); Appellant timely complied on August 5, 2016.

Appellant raises two issues for our review:

> WHERE THE COMMENTS OF THE PROSECUTING ATTORNEY IN CLOSING ARGUMENT AND THE TESTIMONY ELICITED BY THE COMMONWEALTH CREATED A SITUATION WHERE THE UNAVOIDABLE EFFECT OF SUCH COMMENTS WAS TO PREJUDICE THE JURY, FORMING IN THEIR MINDS FIXED BIAS AND HOSTILITY TOWARDS [APPELLANT] SO THAT THEY COULD NOT WEIGH THE EVIDENCE OBJECTIVELY AND RENDER A TRUE VERDICT, WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO OBJECT TO THOSE STATEMENTS AND EVIDENCE?
>
> UNDER CIRCUMSTANCES WHERE THE TRIAL JUDGE CLEARLY STATED THAT THE FACEBOOK ACCOUNT NAME OF "SNITCH-FREE-JAY" COULD BE USED FOR A LIMITED PURPOSE AND WHERE THE PROSECUTOR EXCEEDED THE SCOPE OF THE USE OF THE ACCOUNT NAME BY USING THAT NAME IN SUCH A WAY THAT TRIAL COUNSEL CONCEDED WAS "HURTFUL TO MY CLIENT'S CASE," "ABSOLUTELY DAMAGING" TO HIS CLIENT'S STRATEGY TO PURSUE A MANSLAUGHTER VERDICT, AND THE KIND OF

"LABEL" THAT WEARS AWAY AT THE MANSLAUGHTER DEFENSE THAT HE WAS TRYING TO BUILD UP FOR HIS CLIENT, WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO OBJECT TO EXPANDED USE OF THE "SNITCH-FREE-JAY" TESTIMONY?

(Appellant's Brief at 4).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record supports the court's determination and whether the court's decision is free of legal error. **Commonwealth v. Ford**, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. **Commonwealth v. Boyd**, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. **Commonwealth v. Dennis**, 609 Pa. 442, 17 A.3d 297 (2011).

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." **Commonwealth v. Harris**, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>
> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of

- 12 -

such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

*Id.* at 927 (quoting ***Commonwealth v. DeJesus***, 567 Pa. 415, 438, 787 A.2d 394, 407-08 (2001), *cert. denied*, 537 U.S. 1028, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002)). "[A] new trial is required only when a prosecutor's improper remarks are prejudicial, *i.e.,* when they are of such a nature or delivered in such a manner that they may reasonably be said to have deprived the defendant of a fair and impartial trial." ***Commonwealth v. Davis***, 554 A.2d 104, 111 (Pa.Super. 1989), *appeal denied*, 524 Pa. 617, 571 A.2d 380 (1989).

"A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." ***Commonwealth v. Brown***, 911 A.2d 576, 580 (Pa.Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007). Settled Pennsylvania law states, "[T]he prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom…." ***Commonwealth v. Hogentogler***, 53 A.3d 866, 878 (Pa.Super. 2012) (quoting ***Commonwealth v. Judy***, 978

A.2d 1015, 1019-20 (Pa.Super. 2009)).

The law presumes counsel has rendered effective assistance. *Commonwealth v. Gonzalez*, 858 A.2d 1219, 1222 (Pa.Super. 2004), *appeal denied*, 582 Pa. 695, 871 A.2d 189 (2005). To prevail on a claim of ineffective assistance of counsel, a petitioner must show, by a preponderance of the evidence, ineffective assistance of counsel, which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa.Super. 2007), *appeal denied*, 596 Pa. 707, 940 A.2d 365 (2007). The petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable strategic basis for his action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Id.* "The petitioner bears the burden of proving all three prongs of the test." *Id.* "Where it is clear that a petitioner has failed to meet any of the three, distinct prongs of the…test, the claim may be disposed of on that basis alone, without a determination of whether the other two prongs have been met." *Commonwealth v. Steele*, 599 Pa. 341, 360, 961 A.2d 786, 797 (2008).

A defendant raising an ineffectiveness claim is required to show counsel's ineffectiveness was of such magnitude that it "could have

reasonably had an adverse effect on the outcome of the proceedings." ***Commonwealth v. Pierce***, 515 Pa. 153, 162, 527 A.2d 973, 977 (1987). In other words, there must be a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different. ***Commonwealth v. Cox***, 581 Pa. 107, 125, 863 A.2d 536, 546 (2004). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Commonwealth v. Chambers***, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002). "When it is clear the party asserting an ineffectiveness claim has failed to meet the prejudice prong of the ineffectiveness test, the claim may be dismissed on that basis alone, without a determination of whether the first two prongs have been met." ***Commonwealth v. Wright***, 599 Pa. 270, 320-21, 961 A.2d 119, 148-49 (2008).

For purposes of disposition, we combine Appellant's issues. Appellant first argues trial counsel should have objected to several comments the Commonwealth made in its closing argument. Appellant asserts the Commonwealth referred to Appellant as cold, emotionless, "a dangerous man," "a killer," and a "cold-blooded killer," who committed "a cowardly killing." Appellant submits the Commonwealth's reference to Appellant as a cold-blooded killer was an expression of the prosecutor's personal belief, which constitutes prosecutorial misconduct under ***Commonwealth v. Capalla***, 322 Pa. 200, 185 A. 203 (1936). Appellant contends the Commonwealth stated Appellant was disingenuous and lying in his pursuit of

a voluntary manslaughter verdict. Appellant avers the Commonwealth also noted Victim was unable to respond to attacks on Victim's character at trial as a result of Appellant's conduct. Appellant maintains trial counsel was ineffective for failing to object to these comments in the Commonwealth's closing argument as unduly prejudicial.

Appellant further argues trial counsel should have objected to the Commonwealth's use of Appellant's Facebook profile name, Snitch-Free Jay, which impugned Appellant's character. Appellant contends the Commonwealth used Appellant's Facebook username to label Appellant as "snitch free," imply Appellant had something to hide, and depict Appellant's consciousness of guilt. Appellant submits the Commonwealth's illustration of him as "snitch free" eroded Appellant's defense in pursuit of a voluntary manslaughter verdict. Appellant maintains trial counsel was ineffective for failing to object to the Commonwealth's use of Appellant's Facebook profile name as unduly prejudicial character evidence. Appellant concludes this Court should reverse and remand for a new trial. We disagree.

Instantly, concerning Appellant's first claim, the PCRA court reasoned the Commonwealth's closing argument comments did not constitute prosecutorial misconduct:

> [S]uch statements must be considered in the context of the evidence and the reasonable inferences from that evidence. [**Commonwealth] v. Chamberlain**, 612 Pa. 107, 153, 30 A.3d 381 408 (2011)[, *cert. denied*, ___ U.S. ___, 132 S.Ct. 2377, 182 L.Ed.2d 1017 (2012)] ([providing] prosecutor [was] free to argue that the

defendant was a "murderer" where inferences from the evidence led to the conclusion that the defendant murdered the victim in the case). … Further, the prosecution is entitled to present an argument based upon the evidentiary record "as to why the defense theory [is] not worthy of belief." [**Commonwealth**] **v. Cooper**, 596 Pa. 119, 142, 941 A.2d 655, 669 (2007).

*   *   *

[Appellant] admittedly shot and killed [Victim] in this case. His defense was that he should be convicted of voluntary manslaughter rather than first-degree murder. The Commonwealth's statement [regarding Victim's unavailability at trial] was thus merely a statement of the undisputed evidence in this case that [Appellant] killed [Victim], as well as a response to [Appellant]'s argument and evidence about [Victim's] alleged drug dealing. Indeed, [t]he Pennsylvania Supreme Court has previously found exactly the same "forever silenced" language to be unobjectionable as being a legitimate argument by the Commonwealth in a case of first-degree murder. [**Commonwealth**] **v. Hall**, 549 Pa. 269, 287, 701 A.2d 190, 199 (1997)[, *cert. denied*, 532 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998)] ([stating]: "Here, the 'forever silenced' remark…was an attempt by the prosecutor to explain to the jury the difficulty of proving the intent to kill and that such intent must be inferred from the facts and circumstances surrounding the killing since the victim cannot testify"). The prosecution's argument in this statement was thus plainly unobjectionable.

*   *   *

In [**Commonwealth v. Burno**, 626 Pa. 30, 62, 94 A.3d 956, 975 (2014), *cert. denied*, ___ U.S. ___, 135 S.Ct. 1493, 191 L.Ed.2d 435 (2015)], the defendant objected to the Commonwealth's statement during closing argument that "[t]he coward shot him while he was down on the ground. I know that. Fact." … In that case, the Supreme Court held that the defendant's argument did not even meet the arguable merit prong of the [ineffective assistance of counsel] test. …

- 17 -

When viewed in context, we conclude the prosecutor's statement, suggesting [the defendant] shot [Victim] while [Victim] was lying on the ground, was a permissible appeal to the jury to make a logical inference from the evidence adduced at trial in support of the Commonwealth's theory, which was naturally opposed to the defense's theory. The statement was a fair comment based on the evidence presented at trial….

[**Burno, supra** at 62, 94 A.3d at 975.] Similarly, the prosecution's argument in this case that the killing of the victim was cowardly was likewise based upon the evidence that [Appellant] shot the victim as [the victim] fled across the street, and that [Appellant] should therefore be found guilty of first-degree murder and not merely voluntary manslaughter. Additionally, in calling [Appellant] a killer, the assistant district attorney "did not merely label Appellant a murderer." [**Chamberlain, supra,** at 153], 30 A.3d at 408. "Rather," as in **Chamberlain**, the Commonwealth, "argued that the evidence and the reasonable inferences therefrom led to the conclusion that Appellant was a murderer. By asserting that the evidence led to the conclusion that Appellant was guilty, the prosecutor did not advocate his personal belief of Appellant's guilt." **Id.**

With regard to the Commonwealth's references to [Appellant] being cold and collected, similar arguments have also been held equally permissible. **See, e.g.,** [**Hall, supra**]. In **Hall**, a capital case, the prosecution offered the following argument:

And I would like to end by stating that the only thing colder than the grave of [the victim], is this guy's heart. The only thing colder, because he put him there, and he made sure he was going there. Because if he didn't shoot the second time, we might not be here. But he wanted to put him there the first time, and the instinct saved him, and the second time there was no instinct in the world that could have saved him, because he intentionally shot and killed him. And he walked out coolly, calmly, and collected, with a .357 revolver waving at patrons

- 18 -

in the store.

*Id.* at 289, 701 A.2d at 200. The defendant challenged the remark as improper. The Supreme Court disagreed:

A distinguishing feature of first-degree murder is the presence of malice which may be found from the circumstances surrounding the murder. Malice can be demonstrated by evidence of "wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." Here, the prosecutor's comments were not made for the sole purpose of inflaming the passion of the jury and impairing their ability to render a fair verdict. Rather, the prosecutor was recounting the evidence produced at trial and how this evidence showed that appellant killed the victim with the necessary malice for first-degree murder. Therefore, we find that the prosecutor's reference to appellant's "cold heart" was proper argument since he was merely arguing a reasonable inference which could be drawn from the evidence.

*Id.* at 289-90, 701 A.2d at 200 (internal citation omitted).

As in *Hall*, …the Commonwealth's argument was based upon the evidence presented at trial, as demonstrated by another portion of argument: "[COMMONWEALTH]:…He's so cool and collected, he stops at a store and gets water after having just emptied his firearm, three shots in the back of an unarmed man. Not only does he drink water. He starts making phone calls." [N.T. Trial, 4/12/13, at 42]. There is no material difference between this argument and the Commonwealth's permissible argument in *Hall*, where the prosecution stated:

After he was laughing, joking, showing guns…he went back to Philly, he went back to McDonald's, he ate, went home, and then he went to visit his daughter. After he shot and killed a man, just went about as in every other perfect normal day. That tells you tons about his mind, what was in it.

***Hall***[*, supra*] at 288, 701 A.2d at 200.  Thus, the Commonwealth's argument, essentially that [Appellant] had the required malice to be found guilty of first-degree murder contrary to the argument at trial that he should be found guilty only of manslaughter, was clearly unobjectionable.  ***Id.***

[Appellant] cites…[***Commonwealth***] ***v. Capalla***, 322 Pa. 200, 204, 185 A. 203, 205 (1936), in which the Pennsylvania Supreme Court held that it was reversible misconduct for a prosecutor to refer to the [d]efendant as a "cold blooded killer."  This [c]ourt has devoted substantial research to this issue, and has determined that the last time this case was cited in a published decision was in 1991, [***Commonwealth***] ***v. MacBride***, …587 A.2d 792, 796-97 ([Pa.Super.] 1991),[*appeal denied*, 529 Pa. 618, 600 A.2d 534 (1991)]….  The last time it was cited by the Pennsylvania Supreme Court was in 1987, [***Commonwealth***] ***v. White***, 515 Pa. 348, 352-53, 328 A.2d 596, 598-99 (1987)….  Thus, ***Capalla*** has not been cited once for twenty-five years, and not with reference to calling a defendant a "cold blooded killer" in over thirty years.

More recent precedent, particularly ***Hall*** and ***Chamberlain***, …indicates that…referring to a defendant in a murder trial as a "murderer" or "killer," or a killing as "cold blooded," may be regarded as oratorical flare where there is sufficient evidence to support the allegations that the defendant killed the victim in the case.  The context in this case should be particularly noted.  The sole issue presented to the jury was whether [Appellant] was guilty of voluntary manslaughter due to provocation or murder of the first degree.  [Appellant]'s trial counsel argued strenuously and repeatedly that [Appellant] could only be found guilty only of voluntary manslaughter.  In this context, the prosecutor's reference to a "cold blooded" killing could well be regarded by the lay person and jury member as argument that the killing was not due to provocation but rather a "willful, deliberate and premeditated killing."  18 Pa.C.S.A. § 2502; Merriam-Webster, Merriam-Webster's Collegiate Dictionary, 224 (10th ed. 1995) (defining "in cold blood" as "with premeditation: DELIBERATELY").

*    *    *

Thus, based upon the more recent precedent, the plain meaning of the prosecutor's words, and the context of the Commonwealth's argument, the [c]ourt finds nothing objectionable in these statements which [Appellant] complains of.

*    *    *

To summarize, none of the statements [Appellant] complains of regarding the killing of the victim in this case can be properly characterized as either objectionable or impermissible. Rather, as the case law makes abundantly clear, they were reasonable arguments based upon the evidence at trial and fair responses to [Appellant]'s own arguments that preceded it. Because none of the prosecution's statements about the killing were objectionable, [Appellant]'s argument about these statements fails to have arguable merit. [Appellant]'s trial counsel was therefore not ineffective.

(PCRA Court Opinion, filed June 16, 2016, at 7-17) (some internal citations, quotations, and parentheticals omitted).

Concerning the Commonwealth's statements that Appellant was lying and disingenuous, the PCRA court reasoned as follows:

"[I]t is settled that the prosecutor may comment on credibility, as long as the comment does not involve an assertion of personal opinion." [**Commonwealth**] **v. Jones**, 571 Pa. 112, 132, 811 A.2d 994, 1006 (2002). The prosecution is entitled to present an argument based upon the evidentiary record "as to why the defense theory [is] not worthy of belief." **Cooper**[**, supra**] at 142, 941 A.2d at 669. The Supreme Court "has held that a prosecutor's comments stating that a defendant had lied were neither unfair nor prejudicial when given in response to the comments of defense counsel in relation to the credibility of witnesses, and when they were supported by the evidence." [**Commonwealth**] **v. Koehler**, 558 Pa.

334, 363, 737 A.2d 225, 240-41, n.23 (1999)[, *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000)] (specifically noting that the prosecution did not say "in his opinion" that the defendant had lied).

There is no question that the Commonwealth is permitted to argue about a [d]efendant's testimony from the witness stand as well as his credibility where there is evidence and reasonable inferences to support it. ***See, e.g.,*** [***Commonwealth***] ***v. Floyd***, 506 Pa. 85, 93, 484 A.2d 365, 369 (1984) ([providing] argument that the defendant "out and out lied to you about that particular sentiment" was a fair inference)…; [***Commonwealth***] ***v. Chmiel***, 585 Pa. 547, 620, 889 A.2d 501, 544 (2005)[, *cert. denied*, 529 U.S. 848, 127 S.Ct. 101, 166 L.Ed.2d 82 (2006)] ([stating:] "[T]he prosecutor may comment on the credibility of witnesses").

The crux of this entire case was whether [Appellant] had the requisite mental state to form the malice to commit first-degree murder as opposed to only voluntary manslaughter. Thus, when [Appellant] took the stand and testified as to his mental state, and when his trial counsel presented repeated forceful argument that he had not formed the requisite malice and that the jury could only find voluntary manslaughter under the evidence, his credibility was clearly placed at issue, an issue which the Commonwealth would have been remiss not to comment on. Similarly, the Commonwealth was permitted to argue against [Appellant]'s theory of the case.

Numerous eyewitnesses testified to [Appellant]'s actions that day. There was ample circumstantial evidence, not the least of which were the three bullets in the fleeing victim's back, to challenge [Appellant]'s assertions that he…did not intend to kill [Victim]. The Commonwealth was thus plainly entitled, if not obligated, to argue against [Appellant]'s assertion that he acted without malice and that his statements to the contrary should not be believed. At no time did the assistant district attorney insert his personal opinion as to [Appellant]'s credibility. His arguments were thus fair, based upon the evidence, and clearly responsive to [Appellant]'s own argument. These comments were thus unobjectionable.

- 22 -

* * *

> To summarize, the argument given by the Commonwealth on [Appellant]'s credibility and theory of the case was responsive to trial counsel's argument and based upon the evidence admitted at trial and the legitimate inferences from that evidence. Thus, [Appellant]'s complaints against these statements do not meet the arguable merit prong [of the ineffective assistance of counsel test], and [Appellant]'s trial counsel was therefore not ineffective.

(**Id.** at 17-21) (internal citations omitted).

Regarding Appellant's claim that his Facebook username was objectionable as inadmissible character evidence, the PCRA court also explained:

> [T]here is clearly no issue whatsoever that [Appellant] created and exercised control over the Facebook page titled "Snitch-Free Jay," that he himself selected that name to identify himself, and that the Facebook page referred to him. It is also plain based upon that, the testimony which was given was neither exclusive to [Appellant] nor utilized as character evidence against him. Rather, the "snitch free" mentality in both the testimony and the argument by counsel for both sides was generalized to the entire community in Linmar, where many people other than [Appellant] regularly refuse to cooperate with police investigations. The entire point of this evidence…was to show that [Appellant] did not believe that witnesses would come forward to inculpate him. [Appellant]'s trial counsel also used this evidence in his closing argument against the credibility of the Commonwealth's witnesses.

> * * *

> [W]hatever the Commonwealth's secret theory of the case may or may not have been [concerning Appellant's Facebook profile name], that was not how the [Facebook username] evidence was used or presented, nor what it was admitted to show. To the extent the Commonwealth

- 23 -

made the statements it did [about its theory of the case], they were argument at sidebar, not evidence. They were out of the hearing of the jury.

\* \* \*

Further, the testimony clearly shows that, despite repeated attempts, [Appellant] refused to be responsive to the Commonwealth's questions [on cross-examination of Appellant]. In spite of this, [Appellant]'s attorney did in fact ultimately raise an objection. The [c]ourt also notes that it instructed the jury at the very commencement of the trial that questions and statements by counsel are not evidence and how the jury should understand objections and sidebar proceedings.

\* \* \*

The [c]ourt…gave the standard instruction on consciousness of guilt due to the evidence of [Appellant]'s flight and concealment, which was supported by the Facebook evidence as showing that [Appellant] knew that he was wanted. [N.T. Trial, 4/12/13, at 64-65].

\* \* \*

[Appellant]…admittedly made the Facebook page and chose to identify himself by the moniker, "Snitch-Free-Jay." Then, after killing [Victim] and fleeing to the house of a person [whom] he adamantly refused to identify on cross-examination, contacted a relation of [Victim] through his Facebook page…. These were all important facts for the jury to consider as not only part of the history and natural development of the events and the offenses, but as relevant evidence regarding [Appellant]'s knowledge that he was wanted, the absence of mistake, consciousness of guilt, identification, motive, and [Appellant]'s credibility as a witness.

In [**Commonwealth**] **v. King**, [959 A.2d 405 (Pa.Super. 2008)], the defendant complained that he was unfairly prejudiced by testimony concerning a t-shirt which he wore prior to murdering his victim. [**Id.** at 417.] The front of the t-shirt bore a red stop sign and the words, "Stop

- 24 -

Snitching," and a tombstone on the back with "R.I.P." written on it. *Id.* at 418. The defendant told the detective investigating the case that it was a warning and indicated that the tombstone image was what happened to people who snitch on him. *Id.* The court in *King* held that it was properly admissible as being relevant and showing the motive of the defendant in killing the victim and that the defendant was not prejudiced. *Id.* …

As the defendant in *King*, so in this case [Appellant] "clothed" himself with the moniker "Snitch-Free-Jay." He shot [Victim] and fled the scene, and then had a dispute with a witness, one of [Victim's] own relations, through his Facebook page that bore the name he admittedly chose. To the extent the name was used in evidence and argument by [the Commonwealth], it was to show [Appellant]'s identity, consciousness of guilt, and absence of mistake, as well as the fact that the "snitch free" mentality was not limited to [Appellant], but rather was general to the entire community. Just as in *King* the "stop snitching" t-shirt showed the defendant's state of mind in murdering [Victim], so in this case [Appellant]'s "snitch free" profile showed his own consciousness of guilt and state of mind in murdering his victim, *i.e.*, that he fled the scene and believed that due to the uncooperative mentality of the locale he would not be inculpated. …

\* \* \*

Most important of all, however, is that no evidence was presented to show that [Appellant] neglected to cooperate in other cases or at other times. Nor was evidence admitted that [Appellant] has a history of not cooperating, or that he has a reputation of not cooperating, or that he has some innate trait that makes him less likely to cooperate. In short, no character evidence was presented. Rather, the evidence showed that he selected a unique name for his Facebook profile to identify himself by, and which evidently reflected his personal opinion or belief, *i.e.*, his mental state, that people should not cooperate with law enforcement. [Appellant] thus confuses identity, beliefs, and states of mind with character traits. The Rules of Evidence, however, make a sharp and practical distinction between the two. *See, e.g.,* Pa.R.E. 404(b)(2)

(distinguishing between evidence presented to show "a person's character" and evidence offered for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). …

If anyone in this case demonstrated [Appellant]'s personal belief that people should not be cooperative with the authorities, he did so himself on cross-examination when he adamantly refused, in spite of his oath, to identify where we went or [whom] he was with. When [Appellant] chose to testify, he exposed himself as a witness to cross-examination. A witness, even a defendant-witness, is subject to having [his] credibility tested. Pa.R.E. 607 ([stating:] "The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules"). [Appellant] was not confronted with character evidence nor with prior crimes or wrongs. He was confronted with the name he identified himself as, a name which was circumstantial evidence of his identity as well has his personal opinion and beliefs about speaking to authorities. This type of belief, clearly evidenced by [Appellant] not in some other case, but in this case, on the witness stand, at trial, under oath, before the jury, goes directly to [Appellant]'s credibility as a witness, and the jury was entitled to hear it.

* * *

Because the [Facebook] evidence was admissible on multiple bases, because the jury was properly instructed, because the argument the jury heard was based on the evidence at trial and responsive to [Appellant]'s argument…, [Appellant]'s argument that his trial counsel should have objected has no arguable merit. His trial counsel was therefore not ineffective.

(*Id.* at 24-37) (internal citations omitted). Accordingly, the PCRA court reasoned the claims underlying both of Appellant's ineffective assistance of counsel issues lacked arguable merit. *See Turetsky, supra*.

Concerning whether trial counsel had a reasonable basis for failing to

object to the alleged prosecutorial misconduct and the Commonwealth's use

of Appellant's Facebook username, the PCRA court explained:

> When asked about the Commonwealth's argument that [Appellant] was "cold blooded" and a "killer,"…trial counsel testified [at the PCRA hearing] that he did not believe the Commonwealth's argument and questioning of [Appellant] was objectionable, and second that he believed the assistant district attorney's argument and demeanor would be perceived negatively by the jury.
>
> \* \* \*
>
> [Appellant]'s trial counsel similarly testified that he regarded the Commonwealth referring to [Appellant] as "dangerous" as argument and not opinion. … Regarding the reference to [Victim] at the beginning of the Commonwealth's argument, …trial counsel testified that he believed that the Commonwealth was simply responding to his argument and contending that [Victim] was murdered. …
>
> \* \* \*
>
> Regarding the Commonwealth's references to [Appellant] during cross-examination as "Snitch-Free-Jay," trial counsel testified that he did not object because he believed the nature of the cross-examination was hurtful to the prosecution. …
>
> \* \* \*
>
> [T]rial counsel further elaborated:
>
>> [TRIAL COUNSEL]: …I felt that [the Commonwealth] was ignoring the defense that was put forward and that that was playing favorably with the jury, because [the Commonwealth] wasn't actually addressing what the defense, itself, was.
>>
>> [N.T. PCRA Hrg., 2/26/16,] at 85-86 (explaining further that [trial counsel] did not regard the Commonwealth's argument that [Appellant] was "disingenuous"…as an

- 27 -

impermissible attack on [Appellant]'s defense).

\* \* \*

[Appellant]'s trial counsel in this case has provided, in great detail, the reasons for acting as he did in the objections he made as well as the objections he did not make. He explained his strategy and belief for practically every individual statement and piece of evidence [Appellant] challenges. He testified that he believed the prosecutor's arguments and cross-examination were being received unfavorably by the jury and that he did not object on that basis. [T]his is clearly a reasonable trial strategy, and it is not for this [c]ourt to second-guess [Appellant]'s capable trial counsel simply because…[Appellant] was convicted.

[B]ecause [Appellant]'s trial counsel had a reasonable strategic basis for what he did and did not do, [Appellant]'s trial counsel was not ineffective.

(*Id.* at 38-43) (internal citations to record omitted). Accordingly, the PCRA court concluded Appellant had failed to meet his burden to prove trial counsel lacked a reasonable strategic basis for those inactions Appellant alleged. *See Turetsky, supra*.

Finally, with respect to whether trial counsel's alleged ineffective assistance prejudiced Appellant at trial, the PCRA court reasoned as follows:

Because [Appellant]'s claims have no arguable merit and his trial counsel had a reasonable strategic basis for his actions, …[Appellant] cannot be found to have been prejudiced. But even assuming, *arguendo*, that any of the evidence or argument was erroneously not objected to by [Appellant]'s trial counsel, or that [Appellant]'s trial counsel did not have a reasonable strategic basis, [Appellant] still fails to prove what prejudicial effect this had upon him. …

The weight and sufficiency in this case have already been

challenged on appeal and affirmed by the Superior Court. The evidence against [Appellant] was overwhelming. [Appellant] and [Victim] were in a fight. A surveillance video showed a great deal except for the actual fight and shooting, and there were numerous eyewitnesses [who] testified to seeing both. [Appellant] himself admitted killing [Victim], who was shot three times from behind as he fled. One of the bullets pierced his aorta and [Victim] bled to death in the street. [Appellant] then fled into the woods, absconded to Pittsburgh, and eluded capture until finally turning himself in a month later.

[Appellant] posits that if only the Commonwealth had not called [Appellant] by his admitted self-chosen Facebook profile name, the trial would have been different. There is nothing at all in the evidence to show that this is the case. The jury was properly instructed and a few references to [Appellant] being "snitch free" when the same term was applied to the Commonwealth's witnesses and the Linmar area as a whole cannot be regarded as prejudicial given the considerable evidence in the case.

[Appellant] claims if only he had not been called a killer, the trial would have been different. [Appellant] was on trial for murder. The very nature of the charges is an allegation that [Appellant] killed someone. There was no evidence or implication that [Appellant] had killed before or that he had a reputation for killing. No reasonable person in the context of this case could have concluded that the Commonwealth was arguing anything other than the murder charge alleged, to wit, that [Appellant] killed [Victim].

[Appellant] states that if the Commonwealth had not argued that he was "disingenuous" and "lying," the result would have been different. … Given the testimony of [Appellant]'s trial counsel [at the PCRA hearing] that the jury appeared to receive the Commonwealth's argument negatively, it appears far more likely that the jury was swayed by the copious amount of evidence…than anything the prosecutor said.

[Appellant] asserts that referring to him as "cold blooded" incited the jury to act out of passion rather than according

> to the evidence. [Appellant] himself admitted the killing, and claimed as his defense that it was provocation, not planning, that led to the killing. … Given the volume of evidence in this case, it cannot be said that using a figure of speech, "cold blooded," to describe what the Commonwealth argued was a deliberate killing was [unduly] prejudicial in this case.

(*Id.* at 44-46) (internal citations omitted). Accordingly, the PCRA court determined Appellant had failed to show that but for trial counsel's alleged ineffectiveness, there is a reasonable probability the trial outcome would have been different. *See Turetsky, supra*. The record supports the court's analysis, and we see no reason to disturb it. *See Ford, supra*; *Harris, supra*. Therefore, Appellant's ineffective assistance of counsel claims fail.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/22/2017